Frances THOMPSON, Jeanette Patenaude and Mary Holmes, Plaintiffs,

v.

BINGHAMTON HOUSING AUTHORITY; John D. Lake, Individually and in his capacity as Executive Director of the Binghamton Housing Authority; Samuel R. Pierce, Secretary of the U. S. Department of Housing and Urban Development, and the United States Department of Housing and Urban Development, an agency of the United States government, Defendants.

No. 82–CV–85.

United States District Court, N. D. New York.

Sept. 3, 1982.

Broome Legal Assistance Corp., Binghamton, N. Y., for plaintiffs; Linda Mills-Erickson, Elmira, N. Y., of counsel.

Twining, Nemia & Hill, Binghamton, N. Y., for defendant Binghamton Housing Authority; Joseph Steflik, Jr., Binghamton, N. Y., of counsel.

Gustave DiBianco, U. S. Atty., Syracuse, N. Y., for defendants Pierce and U. S. Dept. HUD; Nancy S. Jones, Asst. U. S. Atty., Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiffs, three public housing tenants in Binghamton, New York, commenced this action against their landlord, the Binghamton Housing Authority ("BHA"), the Executive Director of BHA, the Secretary of the United States Department of Housing and Urban Development and the Department itself ("HUD"). Plaintiffs seek declaratory relief and an injunction to restrain the defendants from expending any money toward, or commencing work on the installation of individual utility meters at the Saratoga Apartments, and to further restrain the defendants from converting any of the existing gas heating systems to electric heat systems. The challenged utility conversions are part of a comprehensive rehabilitation of the Saratoga Apartments which is being undertaken in conjunction with its conversion from a State-financed public housing project to a federally-financed project under the auspices of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437 et seq. ("the Act"). The entire rehabilitation program is being financed with a nine million dollar loan of Development funds from HUD to BHA pursuant to 24 C.F.R. § 841.101 et seq. ("the Development regulations").

Plaintiffs' federal law challenges to the rehabilitation program may be summarized as follows: (1) defendants' failure to accord Saratoga tenants the same "due process" rights to participate in the planning of rehabilitation work that are extended to tenants whose apartments are rehabilitated with so-called Modernization Funds under the Comprehensive Improvement Program, 42 U.S.C. § 1437l(d), violates plaintiffs' rights under the Act and deprives them of due process and equal protection of the laws; (2) defendants' failure to complete a cost/benefit analysis and an energy audit before authorizing the meter and utility conversions at Saratoga Apartments violates applicable HUD regulations, 24 C.F.R. § 865, and (3) the cost/benefit regulations just cited are themselves invalid because they contain energy savings assumptions that lack a rational basis in the administrative record. Plaintiffs also allege that the foregoing actions and omissions state claims

for relief under 42 U.S.C. §§ 1983, 1988, 28 U.S.C. § 2412, 5 U.S.C. § 701, and under New York law. Jurisdiction is asserted under 28 U.S.C. §§ 1331 and 1343[1] with respect to the federal claims, and under the doctrines of pendent and ancillary jurisdiction with respect to the state law claims.

On January 29, 1982, this Court denied plaintiffs' application for a temporary restraining order. An evidentiary hearing on plaintiffs' motion for a preliminary injunction was held on February 3 and 4, 1982. Upon careful consideration of the testimony and evidence presented during the hearing, together with the pleadings, affidavits, exhibits and briefs on file in this matter, the Court issued an oral decision which concluded that plaintiffs had failed to satisfy the requirements for securing a preliminary injunction. The following shall constitute this Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.[2]

## I. BACKGROUND

Defendant Binghamton Housing Authority (BHA) is a public housing authority established by the New York State Legislature in 1948 pursuant to the New York Public Housing Law. BHA owns and operates three public housing projects in the City of Binghamton, New York.[3] This case concerns one of those projects, Saratoga Apartments. Built in the early 1950's, the Saratoga Apartments project contains 258 apartment units which are divided between what were formerly known as Saratoga Terrace Apartments and Saratoga Heights Apartments.

Since their construction, the Saratoga Apartments have been subsidized by the State of New York. According to defendant Lake, who became Executive Director of the BHA in 1978, the State operating subsidy during his tenure was inadequate to cover all operating expenses or to undertake needed renovation of these thirty-year old buildings. (Motion for TRO, Appendix C). As a result of these financial constraints, Lake received complaints from tenants concerning faulty equipment, inadequate space for storage, parking and play areas, as well as complaints that some apartments received excessive heat while others did not receive enough, and that there were cold air leaks around doors and windows during the winter months. *Id.* It was against this background that the BHA considered applying to HUD for "federalization" of the Saratoga Apartments in 1980. *See* Affidavit of John Lake, February 2, 1982; Ex. D. Before turning to the details of the proposed development of the Saratoga Apartments as a federally-assisted project, it may be helpful to identify the

---

1. The complaint cites 28 U.S.C. § 1443. That section, however, provides for removal of certain civil rights actions from state courts and has no apparent application to this case. On the assumption that plaintiffs intended to cite 28 U.S.C. § 1343, which is the jurisdictional counterpart for a class of cases under § 1983, the Court will deem the complaint amended in this particular.

2. Subsequent to the denial of preliminary injunctive relief but prior to the completion of this opinion, this matter came before the Court on a motion to dismiss the complaint as against defendants BHA and Lake. The grounds asserted in the motion and this Court's rulings may be summarized as follows: (1) plaintiffs' purported § 1983 claim against the BHA and Lake sufficiently alleges that these defendants acted under color of state law; (2) defendants' reliance on New York's four month statute of limitations is misplaced; under *Pauk v. Bd. of Trustees of City U. of N. Y.,* 654 F.2d 856 (2d Cir. 1981), all § 1983 actions in this Circuit are governed by New York's three year statute of limitations; (3) the complaint is not subject to dismissal against Lake in his individual capacity on qualified immunity grounds, since the burden of pleading and proving such immunity rests on the defendant. In accordance with these rulings, the motion to dismiss was denied in its entirety. Shortly thereafter, plaintiffs voluntarily discontinued the action against Lake in his individual capacity.

3. In addition to the Saratoga Apartments, BHA also owns and operates two federally-subsidized public housing projects in the City of Binghamton, viz., the Carlisle and North Shore projects.

statutes and regulations on which the parties rely.

## A. Statutory Overview

The United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974, 42 U.S.C. § 1437 *et seq.,* established a comprehensive system of federal assistance to aid State and local governments in dealing with a vast array of urban problems. Under Title I of the Act, localities may apply for community development grants which, while not available for housing construction purposes, are designed in part to foster "the undertaking of housing and community development activities in a coordinated and mutually supportive manner." 42 U.S.C. § 5301(d)(4). In order to qualify for Title I funds, a locality's grant application must include a "housing assistance plan" (HAP) that "accurately surveys the condition of the housing stock in the community and assesses the housing assistance needs of lower-income persons . . . residing in or expected to reside in the community . . . ," *Id.,* § 5304(a)(4)(A), and a "realistic annual goal" specified for such housing assistance. *Id.,* § 5304(a)(4)(B).

Title II, on the other hand, provides federal funds necessary to meet the locality's need for lower-income rental housing. As Judge Oakes explained in his decision for the panel in *City of Hartford v. Towns of Glastonbury,* 561 F.2d 1032, 1035–36 (2d Cir. 1976), rev. on rehearing *en banc,* 561 F.2d 1048 (1977):

> The Housing needs detailed in the HAP can then be met with funds available under Title II of the Act. Thus . . . the HAP serves as the vehicle tying together the community development and housing assistance portions of the Act, in furtherance of the Act's overall goal of coordination of federal urban efforts, *see id,* § 5301(d).

Title II of the Act, then, is a federal-state, cooperative grant program, which is designed,

> to promote the general welfare of the Nation by employing its funds and credit,

as provided in this Act, to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income and, consistent with the objectives of this Act, to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs.

42 U.S.C. § 1437. Under Title II of the Act, the Secretary is authorized to make loans to local public housing agencies to help finance the acquisition, development or operation of lower-income rental housing. *Id.* § 1437b. The Secretary is also authorized to enter into "annual contributions" contracts with public housing agencies to "assist in achieving and maintaining the lower-income character of their projects." *Id.* §§ 1437c and 1437g.

### 1. The Development Phase Regulations.

Pursuant to the statutory loan authority contained in § 1437b, the Secretary has promulgated regulations governing the initial or development phase of a housing project for which federal financing is being sought by the local public housing agency. *See* generally, 24 C.F.R. § 841.101 *et seq.* (Development regulations). Under these regulations, there are two basic methods by which "federalization" of a housing project may be achieved: (1) by building the housing project from the ground up (i.e., "new construction" using either the "turnkey" or "conventional" method, *see id.* §§ 841.201, 841.301) or, (2) by acquiring existing buildings which may or may not require substantial rehabilitation (i.e., "acquisition" method, *see id.* § 841.401). Properties which are eligible for federalization under the acquisition method include properties such as the Saratoga Apartments, which the public housing agency already owns, *id.* § 841.402(a)(3). In deciding whether to develop a particular property by the acquisition method, the public housing agency is directed to consider: (1) site and construction standards (including the "need for maximizing

the conservation of energy for heating, lighting and other purposes," *id.* § 841.-107(c)(v); (2) "The design and quality of original construction as well as the degree, complexity and cost of rehabilitation necessary to place the property in acceptable physical condition," *id.* § 841.402(b)(1); and (3) "The feasibility of relocating site occupants during and after rehabilitation and availability of funds for this purpose, if applicable," *id.* § 841.402(b)(2). Finally, the regulations provide that necessary rehabilitation work may be accomplished using either the conventional or the turnkey method. *Id.* § 841.405.

As will be discussed below, the BHA developed the Saratoga Apartments with Development funds, using the acquisition method, and proposed to perform the necessary rehabilitation work through the conventional method (i.e., by contracting with independent architects and contractors to plan and execute the renovations). However, because plaintiffs' challenges to the utility and meter conversions rest primarily on defendants' failure to comply with requirements contained in two separate regulatory programs, we turn briefly to those provisions.

## 2. The Modernization Regulations.

In addition to providing loans for the rehabilitation of existing buildings which are in the process of being "federalized"

under the acquisition method, Congress also recognized the need to provide financial assistance to those public housing projects that began receiving federal contributions in earlier years but which are now in need of modernization. Under what is now known as the "Comprehensive Improvement Assistance Program," 42 U.S.C. § 1437*l*, Congress specified that modernization funds would be made available only to lower-income, rental housing projects which are owned by a public housing agency and which are already receiving federal assistance in the form of an annual contributions contract with HUD pursuant to §§ 1437c or 1437g. *See id.* § 1437*l*(c).[4] The regulations governing the Modernization program are contained in 24 C.F.R. § 868.1 *et seq.* The regulations specify the types of major repairs and capital improvements which are deemed priority work items for a modernization proposal, including work items relating to energy conservation. *Id.* § 868.3. Where modernization funds are sought on behalf of a lower-income rental project, the public housing agency is required to provide tenants "a reasonable opportunity to present their views on the proposed program and alternatives to it, and give full and serious consideration to resident recommendations." *Id.* § 868.5.[5] The public housing agency must then provide HUD with an evaluation of the resident recommendations and the agency's reasons for accepting or rejecting them. *Id.* Finally,

---

**4.** Under these eligibility criteria, the BHA's North Shore and Carlisle housing projects would be eligible for Modernization funds since both projects are already receiving federal contributions. Saratoga Apartments, on the other hand, would be ineligible since, until its development and rehabilitation program was accepted, it was a State-subsidized housing project.

**5.** The resident participation section provides in full:

§ 868.5

For a rental project only, the PHA shall notify the residents of the project to be modernized and the residential organization, if any, of the proposed modernization program, afford residents a reasonable opportunity to present their views on the proposed program and alternatives to it, and give full and seri-

ous consideration to resident recommendations. The PHA shall provide HUD with an evaluation of resident recommendations, indicating the reasons for PHA acceptance or rejections, consistent with the priority work items under § 868.3 and the PHA's own determination of efficiency, economy, and need. The PHA shall also provide a copy of this evaluation to the residents and the resident organization, if any. After HUD approval of the modernization program, the PHA shall inform the residents and the resident organization, if any, of the approved work items. The provisions of this section do not apply to proposed work items of an emergency nature, affecting the life, health, and safety of the residents.

following HUD approval of the modernization program, the agency must inform its tenants of the approved work items. *Id.*

### 3. The Utility Submetering and Energy Audit Regulations

In 1976, HUD promulgated individual metering regulations, 24 C.F.R. § 865.401 *et seq.,* applicable to PHA-owned housing projects which are receiving federal contributions under the Act. The regulations were designed to reduce energy consumption and operating costs by requiring that, "to the extent practicable, all Utilities consumed directly by tenants shall be individually metered." *Id.* § 865.401. This objective was to be accomplished either by direct billing for utility usage to the tenant by the utility supplier with the PHA providing the tenant with a reasonable utility allowance ("retail Service"), or by using a mastermeter system in conjunction with individual apartment checkmeters.[6] Under the checkmetering option, the PHA would continue to purchase bulk utilities from the supplier, but, by use of checkmeters, would surcharge tenants for utility consumption in excess of a reasonable requirement. *Id.* The regulation directed public housing agencies to undertake one or the other of these utility meter conversions unless (1) the conversion would be physically impracticable, (2) the conversion would not be cost effective based upon the result of a cost/benefit analysis, or (3) checkmetering

is illegal under applicable state or local law or contrary to the policies of a particular utility supplier or public service commission (in which case, retail service is the only option that should be considered). *Id.* § 865.403.

In determining the cost effectiveness of individual metering, the public housing agency is directed to undertake a standard cost/benefit analysis. *See id.* § 865.404. Plaintiffs, however, raise a secondary challenge to HUD's inclusion of percentage factors of assumed energy savings said to be associated with individual metering. These percentage factors, which range from fifteen to thirty-five percent for varying energy uses (e.g., lighting, space heating, hot water and cooking), are the subject of a pending lawsuit entitled, *Mass. Union of Public Housing Tenants v. Harris,* Civ. No. 78–1895 (D.D.C.) (on remand from the Court of Appeals with directions to remand to HUD for a reasoned explanation of the assumption that individual metering will result in a 25–35% reduction in fuel used for space heating).

The regulations also direct the public housing agency to consult with tenants concerning proposed meter conversions, "explaining the national policy objectives of energy conservation, the changes in charges and rent structure which will result, and the goals of achieving an equitable structure which will be advantageous to tenants who conserve energy." *Id.* § 865.407(c).

---

**6.** The following definitions appear in 24 C.F.R. § 865.402:

(a) "Benefit/Cost Analysis" means a direct comparison of the present worth of any savings generated by a given system during the expected useful life of the system or the estimated remaining life of the project, whichever is the shortest number of years, to the cost of the change.

(b) "Checkmeter" means a device for measuring Utility consumption within each individual dwelling unit where the Utility Service is supplied to the PHA through a Mastermeter. The PHA then ascertains from its reading of the Checkmeter it has installed the amount of tenant usage and Surcharges the tenants for excess usage.

(d) "Mastermeter System" means a Utility distribution system in which a PHA is supplied

Utility Service by a Utility supplier through a system meter or meters and distributes the Utility Service to its tenants.

(e) "Meter Loops" means a device provided to accommodate future installation of a Utility meter.

(h) "Retail Service" means purchase of Utility Service by PHA tenants directly from the Utility supplier.

(i) "Surcharge" means the amount charged to tenants for consumption of Utilities in excess of a reasonable allowance therefore, based on Utility use determined by means of a Checkmeter.

(j) "Utilities or Utility Service" means electricity, gas, heating fuel and water.

Before implementing any new or different utility charges as a result of meter conversions, the local agency must provide both a six month transition period in which tenants are advised of, but not charged for utility consumption in excess of a reasonable allowance, and a thirty day written notice to tenants "setting forth the proposed changes in the lease and providing the tenants an opportunity to present written comments which . . . shall be taken into consideration by the PHA prior to the formal adoption of any new lease by the PHA." 24 C.F.R. § 866.3.

Finally, in May 1980, HUD added a new subpart C to § 865 of the regulations. 45 F.R. 30346 (May 7, 1980). This new subpart requires all public housing agencies which

receive federal contributions to conduct an energy audit by May 1983 and, based on the results of the audit, to undertake certain cost-effective energy conservation measures to the extent that funding is available. In adopting these new energy conservation regulations, HUD retained the individual metering regulations discussed above, but provided that this and other specified energy conservation measures, "be combined into one list to be accomplished generally in order of payback period." 45 F.R. 30346 (May 7, 1980).[7]

B. The Redevelopment of Saratoga Apartments.

On October 14, 1980, the BHA sent a notice to the Saratoga tenants informing

---

7. The term "Payback period" is defined as "the number of years required to accumulate net savings to equal the cost of an energy conservation measure." *Id.* § 865.303(c). The regulations further provide that an energy conservation measure with a payback period of fifteen years or less shall be considered cost-effective. *Id.* § 865.303(d). Some commenters on the proposed rulemaking apparently argued that the cost-effectiveness of individual metering would be artificially enhanced because they read the cost/benefit regulations in § 865.404 as providing a twenty-year payback period for meter conversions, as opposed to the fifteen-year period applicable to all other energy conservation measures listed in the new regulations. HUD responded with the statement that this, "was not accurate, since application of the benefit cost analysis as required in 24 C.F.R. § 865 Subpart D results in a payback period of approximately 12.5 years." 45 F.R. 30346 (Supplementary Information). Since plaintiffs' brief asserts a similarly inaccurate view of the payback period associated with individual metering, we pause to explain that the confusion may have arisen from the fact that the computation of the payback period for energy conservation measures listed in the new subpart, unlike the cost/benefit analysis reserved for individual metering alone, fails to require that net savings projected for future years be discounted to present value before being compared to the cost of the particular measure.

In addition to individual metering, the new regulations provide for consideration of the following energy conservation measures:

(b) Ceiling insulation.
(c) Insulation of bare hot water or steam pipes.
(d) Caulking and sealants in building joints.
(e) Weatherstripping for doors and windows.

(f) Clock thermostats for units with individual heating controls.
(g) Exterior insulation for hot water heaters located in unheated spaces.
(h) Insulation for air ducts in unheated spaces.
(i) Storm doors and windows, replacement of single glazed windows with double glazed windows.
(j) Replacement of incandescent fixtures in public spaces with higher efficiency lighting.
(k) Floor restrictors for hot water lines to shower heads or faucets.
(*l*) Thermostatic radiator valves.
(m) Floor insulation over unheated crawl spaces.
(n) Exterior wall insulation.
(*o*) Improved burners for oil-fired heating equipment.
(p) Improved boiler controls for central, group or building heating plants.
(q) Separate boilers for domestic hot water in central, group or building heating plants.
(r) Heat pumps to replace existing electric resistance heating systems.
(s) Capacitors, peak load controllers, time clock controls and other equipment that will lower the cost of electricity.
(t) Other energy conservation measures that a PHA considers may be cost effective.
(u) Solar energy systems. (The payback period for these systems shall be calculated by multiplying the amount of the estimated net savings by two. This is because solar energy is renewable and because anticipated cost increases in non-renewable energy are not to be considered in calculating their pay-back period).

them of a meeting scheduled for the following week concerning the proposed federalization of the project. Lake Affidavit, *supra,* Ex. A. The notice specifically invited the tenants "to say what improvements you would like to see made at the Saratoga housing complex," and specified that the issue of individual metering of utilities would be discussed. *Id.* It further appears that the engineer in charge of the rehabilitation, Donald Adams, as well as the architect, M. Gamble, attended the meeting at which these issues were discussed with the tenants. Following this meeting, the BHA submitted its final application to HUD for the redevelopment of 258 units pursuant to 42 U.S.C. § 1437b. In accordance with the Development regulations, the application included consideration of the physical aspects of the project, financial feasibility, the administrative capability of the BHA, site analysis, dwelling unit characteristics, project and tenant utility costs, and a certification from the City of Binghamton that the proposed development of the Saratoga Apartments as a federal project conformed to and would advance the objectives of the City's Housing Assistance Plan. *See* Ex. D (attached to Lake Affidavit). With respect to the need for tenant relocation during the rehabilitation, the application stated that off-site relocation was not anticipated because vacancies caused by attrition would provide sufficient empty units to permit construction to proceed with only temporary, on-site relocation of existing tenants. *Id.*

In addition to the October 20, 1980 meeting mentioned above, there were other meetings between BHA and Saratoga tenants during the Fall of 1980 in which proposed federalization of the project was discussed. "Federalization" of the Saratoga Apartments was also the topic of a "Management/Tenant Forum" that was held on March 30, 1981. Further information concerning the scope of the rehabilitation plans was provided to tenants through the "BHA-News," a newspaper that is circulated in all three of the public housing projects managed by the BHA.

HUD approved the Saratoga development application on March 27, 1981. Thereafter, in September the project was let for bidding for four separate contracts, *viz.,* general construction, heating and ventilating, plumbing and electrical. Bids were received and contracts awarded on November 20, 1981. The total HUD Development loan is $9,066,937.00; the present budget for the entire rehabilitation project is $9,054,735.00, leaving a contingency fund of only $12,202.00. The BHA issued the orders to proceed to the successful bidders on December 23, 1981. By the end of January 1982, when the motion for a temporary restraining order was before this Court, most if not all of the four contracting firms were on-site. The project is designed to proceed according to a critical path method, and tenants are being rotated into buildings in which there are vacancies from attrition, while their own buildings are undergoing rehabilitation. At the time of the hearing, there were an estimated fifty vacant apartments; for each month of delay in the project, BHA stands to lose $5,000 in lost rental income alone. It is expected that the rehabilitation will take between eighteen and twenty-four months to complete.

While the plaintiffs' substantive complaints focus on the installation of electric checkmeters and BTU flow-meters and the conversion of three buildings at the Saratoga Heights location from a gas-forced hot air heat system to an electric baseboard system, the record demonstrates that the current rehabilitation plans include numerous additional energy conservation measures. Donald Adams, the professional engineer in charge of the rehabilitation of the Saratoga Apartments, testified that when he developed the project specifications he reviewed the feasibility of a full range of conservation measures and, apart from those challenged here, incorporated the following measures: new attic and ceiling insulation, new wall insulation, insulation of heat and hot water pipes, new caulking, glazing and weatherstripping, installation of storm doors and windows, floor insula-

tion, thermostatic radiator valves and flow restrictors. This catalogue of energy conservation measures compares favorably with the work items specified in the Energy Audit regulations, and demonstrates that individual metering was not pursued at the expense of other conservation techniques. We turn now to the challenged proposals.

As noted above, the Saratoga Apartments project includes two housing complexes, formerly known as Saratoga Terrace and Saratoga Heights. The rehabilitation plans call for the installation of individual checkmeters for electric service throughout the sixteen buildings. The proposed installation of individual BTU flowmeters, however, relates only to the five buildings which comprise the former Saratoga Terrace complex. Finally, the BHA proposes to convert buildings 8, 9 and 16 at the Saratoga Heights location from a gas-forced air heat system to an electric baseboard-hot water system.

### 1. Installation of Electric Service Checkmeters.

Prior to the redevelopment proposal, electrical service was delivered from a central pole over feed lines into each building, and then distributed to main distribution panels located in crawl spaces. These panels are difficult to reach and contain disconnect switches that govern electrical service for two to three apartments. Don Adams, the project engineer, testified that in light of these inadequacies, some modification of the electrical service was needed, and that the applicable New York Electrical Code specified the provision of an accessible meter for each apartment.

Under the project specifications, the electrical service throughout Saratoga Apartments has been redesigned and sized for the addition of electric ranges, which will be provided by the BHA to replace existing gas ranges. The electric utility service itself will now be directed from the central feeder to outside distribution panels, containing a mastermeter and individual checkmeters and service disconnects for each apartment. Under the proposed system, it will be possible to disconnect service to an apartment without thereby interrupting electrical service to other apartments. According to the testimony of BHA's Executive Director, BHA will continue to pay for all electrical service and there are no present plans to institute a tenant surcharge for excessive electrical consumption. The Director concedes, however, that the installation of individual checkmeters will permit BHA to monitor tenants' electrical consumption and to institute a surcharge system in the future if that option appears feasible.

The project engineer testified that the cost of the complete installation of the checkmetering equipment is about $26,000.00; that if BHA is restrained from installing checkmeters, he would recommend the installation of individual disconnect switches on the outside panels, at an estimated cost of $17,000.00 (including $2,000.00 for the cost of redesign and the negotiation of a change order with the electrical contractor), and that if, after making this change, the BHA ultimately is permitted to install checkmeters, the estimated cost would be $35,000.00.

The BHA concedes that they did not perform either an energy audit under § 865.-301 or a cost/benefit analysis under § 865.-401 prior to adopting the project specifications for the foregoing changes in the delivery of electrical utility service at Saratoga Apartments. The Executive Director states that he was informed by HUD officials that the requirements of § 865 did not apply to a rehabilitation project using Development funds under § 841 because the project was not yet federalized. In response to this litigation, however, the project engineer performed a cost/benefit analysis and testified that a conversion from the current mastermetering to use of the proposed checkmeters with a tenant surcharge need only result in a 14% energy savings to achieve a full payback of conversion costs

within five years. *See* BHA Ex. I. He further testified that he was not aware of any electrical utility conversion study which found a lesser percentage factor of energy savings for this type of conversion.

2. Installation of BTU Flow Meters at the Saratoga Terrace Complexes.

The Saratoga Terrace location is comprised of five apartment buildings, each of which has a central heating system composed of a central boiler to heat hot water which is circulated through a main pipe with heating loops which serve between two and four apartments. Although the boilers are in good condition, the apartments themselves are equipped with thirty-year-old, cast iron radiators. Moreover, the present system has a considerable number of exposed pipes and there are no thermostatic controls in the apartments. This lack of individual controls, coupled with the fact that a single heat loop serves between two and four apartments results in a situation where apartments near the boiler room or at the beginning of a heat loop receive excessive heat while other apartments receive insufficient heat. In his review of the entire heat system, the project engineer concluded that this situation at Saratoga Terrace was both inefficient and wasteful, since the only means of dissipating excessive heat was to open the windows in apartments near the boiler.

Based on these findings, the project engineer redesigned the heat system at Saratoga Terrace. The specifications call for retaining the existing central boilers, and installing new, separate heat loops off the main to serve each apartment. In addition, the contract calls for the installation of new baseboard radiators and thermostats in each room which will enable tenants to control the amount of heat on a room-to-room basis. Finally, the contract calls for the installation of a BTU flow meter assembly in each heat loop. The flow meters are designed to measure heat consumption in each apartment by measuring the temperature and mass of water flowing into the loop together with the temperature of the water returning from the apartment loop into the main feeder. These measurements are then relayed to panels in outside utility buildings where the measurements may be used to calculate each apartment's BTU consumption.

The project engineer testified that the flow meters, together with the remote readout panels, will serve two independent purposes in the redesigned system. First, they will enable BHA to monitor heat consumption (measured in terms of BTU usage) in each apartment, and thus could be used in the future to calculate a surcharge for heat consumption in excess of a reasonable allowance. Quite apart from this measuring function, the flow meters serve a diagnostic purpose. If, for example, a tenant complained that her apartment was not receiving enough heat and if a check of the readout panel confirmed this assertion, the BHA would have an indication that the cause was an obstruction in the loop or a mechanical malfunction. Alternatively, if an apartment experienced consistently high usage of heat but the interior temperature was maintained in the normal range, it might mean that the walls or ceiling insulation had been improperly installed or that cold air leaks had developed around doors or windows. Lake, the Executive Director, testified that the BHA will continue to provide heat under the mastermetered scheme, and that there are no present plans to impose a surcharge on tenants who use excessive amounts of heat. While the Director concedes that individual heat consumption will be monitored and the feasibility of surcharges reviewed, the record provides ample support for a finding that prior to imposing surcharges, the BHA must comply with the requirements of § 865 and must also secure the approval of the New York Public Service Commission.

The project engineer testified that under the current contract the cost of the purchase and installation of the flow meter

assemblies, including the conduit to the remote readout panels and the readout assemblies, is about $50,000.00. He further testified that if the BHA were to be enjoined from completing this installation and made no provision for installation at a later date, BHA would recoup only $23,000.00 of that cost,[8] and if the installation is ultimately held to be proper, the future installation would cost between $100,000.00 and $200,000.00.[9] The engineer also stated that if steps were taken to accommodate a future installation of the meters, the projected savings to the project at this time would amount to only $12,000.00, and the future cost would be approximately $75,000.00. Put differently, if the BHA is preliminarily enjoined but is permitted to make some accommodation to cover the eventuality that metering is ultimately allowed, the eventual entry of a permanent injunction against installation will translate into no more than a $12,000.00 savings in a $9 million dollar rehabilitation project; whereas, if judgment is finally entered in favor of the defendants, the BHA would need to secure an additional federal loan for $75,000.00. If, on the other hand, the BHA were to view entry of the requested preliminary injunction as increasing the likelihood of a permanent injunction and therefore makes no provision to accommodate a later installation, the maximum savings in the event that plaintiffs succeed would increase to only $23,000.00; whereas, a final judgment in favor of the defendants would require an additional $100,000.00 to $200,000.00 in federal loans.[10]

Both HUD and the BHA concede that neither an energy audit nor a cost/benefit analysis under § 865 was performed in conjunction with the planned modifications of the heating system in the Saratoga Terrace complex. However, the engineer testified that in the Spring of 1981, he conducted a thorough review of the entire Saratoga Apartments to determine what energy conservation measures should be incorporated into the redevelopment plans. Although his review was not conducted in strict conformity with the Energy Audit regulations, his testimony concerning the range of measures considered for cost-effectiveness and compatability with planned structural changes demonstrates to this Court's satisfaction that the spirit, if not the letter of the regulations was honored. Moreover, at the request of counsel for the BHA, the engineer performed a cost/benefit analysis for the Saratoga Terrace heat system conversion. In accordance with § 865.404, Adams first calculated present annual heating cost to be $124,080.00 using oil consumption and cost data from the preceding year. Second, using HUD's assumption that conversion to individual meters (here, the BTU flow meters) will reduce annual space heating costs by 25%, Adams calculated the gross annual savings to be $31,000.00. Third, he estimated the annual cost of operating the new meters at $2,000.00 and subtracted that amount from the gross savings figure to arrive at an annual net savings after conversion of $29,000.00. Fourth, based on HUD's assumption of a twenty

---

**8.** The engineer testified that the remaining $27,000.00 would be expended on redesign costs, renegotiation costs, and a charge attributable to renegotiating the heating contractor's contract to purchase the meter assemblies. The engineer testified that the contractor's shop drawings were approved on January 19, 1982, and that the contractor had already placed the order to purchase the units at the time of the preliminary injunction hearing.

**9.** The engineer explained that this substantial increase in the cost is based on the fact that he considered the heating contractor's current bid to be low and to the fact that installation at a later date would necessitate tearing out substantial amounts of relatively new work at the

Terrace location in order to accommodate the meters and remote readout conduit.

**10.** It may be that the BHA would be permitted to retain the current savings of either twelve or twenty-three thousand dollars and to apply those funds to any ultimate reinstallation, thereby reducing the future cost estimates accordingly. However, there is nothing in this record to indicate whether HUD would agree to earmark any present savings for BHA's future needs. Moreover, both Lake and Gamble, the project architects, opined that in the immediate future, the prospect of additional loans for Saratoga Apartments is dim.

year stream of annual net savings discounted by the current 8% cost of BHA's borrowings, Adams calculated the present worth of the proposed conversion to be $284,918.00. Since this present worth figure is greater than the $50,000.00 installation cost, the proposed conversion is cost effective within the meaning of the HUD regulations.[11] However, in light of plaintiffs' challenge to HUD's assumption that converting to individual meters will yield a 25% annual saving in space heating costs, Adams performed a second set of calculations using the Saratoga Terrace figures.[12] At the request of BHA's counsel, Adams performed a cost/benefit analysis to determine what percentage of savings in annual heating costs would have to be achieved by conversion to BTU flow meters in order to recoup the $50,000.00 cost of installation within five years, and concluded that conversion need only yield an annual savings of 8% in order to achieve the stated objective. Finally, Adams testified that he was unaware of any engineering study which found that conversion to individual meters produced less than 8% savings.[13]

3. The Conversion of Buildings 8, 9 and 16 From Individual Gas Heaters to Individual Electric Baseboard Heaters.

Unlike the Saratoga Terrace buildings, the nine buildings which comprise the former Saratoga Heights complex contain some ninety-two apartments, each of which has its own gas-fired, forced hot air furnace. Sometime prior to the decision to apply for federalization of the project, the BHA received a grant from New York State to pay for the installation of individual gas meters in each of the ninety-two apartments in the Heights. See Motion for TRO, App. B (Letter from John Lake to Samuel Madison, Sec., N.Y.S.Pub.Serv. Comm., January 4, 1982). This State-financed metering project is at or near completion, and is not challenged in this litiga-

11. The contents of Exhibit H are reproduced below:

BTU METERS
Benefit/Cost Analysis HUD 865.404
Saratoga Terrace
1. Oil Consumption 12 months = 141,000 gal.
Cost 0.881 gal. = $124,080
Avg. Cost per Apt. = $757
2 & 3. Use with check meters per HUD Table page 283
$124,080 × .75 = $93,060
4. Gross annual savings = $31,020
5. Cost of operating meters = $2,000
6. Net annual savings = 29,020
7. Present worth 20 years at 8% factor is 9.818
29,020 × 9.818 = $284,918
8. Estimated Cost of Checkmeter installation is $50,000
9. $50,000 is less than $284,918 therefor install meters

12. The engineer testified that the BTU flow meter assemblies ordered for this project are made by ISTA Energy Systems Corp., a German manufacturer. He further stated that while these meters have been in use in this country for only a few years, they have been used extensively in Europe for the past fifteen years, where they are a well-recognized measuring tool. Based upon his reading of the technical literature Adams stated that the published studies show a twenty to thirty-five percent savings in space heating costs where this type of meter assembly is used to replace a mastermetered system in similar housing projects.

13. On cross examination, Adams stated that he was not familiar with several studies referred to by plaintiffs' counsel which purportedly found lesser savings and, in one case, an increase in heating costs as a result of a meter conversion. These studies, however, were not introduced in evidence, and there was no testimony concerning either the types of fuel or meter assemblies involved. On this record, the Court accepts as reasonable Adams' testimony that a conversion from a mastermetered system to a system employing the BTU flow meters to calculate an excessive consumption surcharge would produce at least an 8% reduction in total heating costs at the Terrace complex. The Court hastens to add, however, that the BHA has no present plans to institute a surcharge at the Terrace, and that no surcharge could be imposed without compliance with §§ 865–866 and the prior approval of the Public Service Commission.

tion.[14] What is challenged, however, is the BHA's plan to convert the individual gas-hot air heating in Buildings 8, 9 and 16 to individual, electric baseboard heating. Since the apartments in these buildings would have had individual heating-fuel meters in any event, plaintiffs' claim is apparently directed at the decision to convert from gas to electric.

Buildings 8 and 9 currently contain multi-bedroom, two story apartments. The redevelopment contract calls for these two buildings to be converted into single bedroom apartments for elderly and handicapped tenants. Building 16 will be designed to house community rooms, maintenance areas, and three apartments for resident maintenance personnel. Adams testified that the structural changes involved in converting these buildings to one bedroom apartments made it financially as well as physically impracticable to retain the individual gas furnaces. To do so, he stated, would require installation of additional gas furnaces, together with the associated duct work to distribute the heated air, new outside-air intakes, and separate flues for each upstairs and downstairs apartment. Because the apartments are being made smaller, however, Adams stated that there simply isn't enough room to include all this equipment given the proposed floor plans. With respect to cost, Adams testified that the cost of installing the electric baseboard units is substantially lower than the cost of accommodating and installing additional gas furnaces. While he conceded that the cost of producing a given amount of heat is higher if electricity is used as the energy source, he calculated that it would take more than fifteen years before the savings associated with using gas would offset the

higher cost of installing individual apartment furnaces in these buildings. The decision to convert from gas to electric baseboard heat in these three buildings was based on a study conducted by the engineer in the Spring of 1981, in which he calculated the cost of heating these apartments. In response to a question from plaintiffs' counsel, Adams stated that he had considered the option of installing a central boiler system similar to those at the Terrace, but promptly concluded that this would be by far the most expensive option. Adams further testified that the heating cost figures which he developed for various fuel sources in these buildings were confirmed by a subsequent study conducted for the Saratoga Apartments by the New York State Electric and Gas Company. In response to questions concerning the relative efficiencies of individual gas-fired forced hot air furnaces versus electric hot water baseboard heaters, Adams pointed out that the latter is far more efficient since in a gas-fired system a considerable amount of energy (heat) escapes up the chimney; by contrast, all of the energy (heat) produced in the baseboard system is available for heating the apartment. In sum, the testimony at the hearing amply supports our finding that the BHA's decision to convert from a gas to an electric heating system in Buildings 8, 9 and 16 at the Heights was a reasonable and cost-effective response to the structural changes involved in converting these to smaller apartments for handicapped and elderly tenants and other special uses in the case of building 16.[15]

## II. DISCUSSION AND CONCLUSIONS OF LAW

On January 28, 1982, after making several unsuccessful efforts to convince either

14. The BHA further advised the New York Public Service Commission in the January 4, 1982 letter that: "Until further notice the Binghamton Housing Authority will continue to pay the monthly invoices for these units but we will have the opportunity to monitor for any waste, tenant-caused or otherwise." *Id.*

15. At the hearing, plaintiffs shifted somewhat from their initial focus on the gas to electric conversion to a challenge of the BHA's underlying decision to convert Buildings 8 and 9 to

single bedroom apartments for elderly and handicapped tenants. While plaintiffs strove to elicit an admission that this underlying decision was ill-conceived given the asserted need for public housing for large lower-income families in the Binghamton area, plaintiffs cited no statute or regulation that was violated by the BHA's decision, nor does the record support a finding that the BHA abused its discretion in

the BHA, HUD or the New York State Public Service Commission to refrain from proceeding with the proposed BTU metering, the electrical metering and the gas to electrical heating conversion in Building 8, 9 and 16, plaintiffs filed this lawsuit. In reviewing their individual claims in the context of the requested preliminary injunction, it must be born in mind that although this is not a class action, plaintiffs expressed no interest in limiting the relief sought to the buildings in which they reside.[16] And while plaintiffs seek to halt only the metering and utility conversion aspects of this development contract, the testimony at the hearing convincingly demonstrates that even such selective stop-work orders would cause substantial interference with an already tight construction schedule, with attendant costs to the BHA from delay claims by contractors and attendant inconvenience to non-party tenants of Saratoga Apartments who are being required to vacate their apartments temporarily while their original apartments are being rehabilitated.

### A. Standard for Preliminary Injunctive Relief

█ In order to secure a preliminary injunction, plaintiffs must make: "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief." *Sperry International Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir. 1980) (quoting *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). In addition, where indi-

vidual plaintiffs challenge the statutory interpretations advanced by the very federal and local agencies charged with administering the Act, and where the relief sought may adversely affect both the interests of tenants who are not before the Court and the broader public interest in a manner than cannot be compensated for by an injunction bond, this Court properly may insist on a substantial evidentiary showing before taking the extraordinary step of imposing costly delays on the rehabilitation of public housing for hundreds of families. *Cf. Union Carbide Agricultural Prod. Co., Inc. v. Costle,* 632 F.2d 1014, 1018 (2d Cir. 1980) ("When Congress authorizes or mandates governmental action that is in the public interest, more than a 'fair ground for litigation' must be shown before the action will be stopped in its tracks by court order."), citing *Medical Society of New York v. Toia,* 560 F.2d 535, 538 (2d Cir. 1977).

### B. Irreparable Injury

On the basis of the foregoing evidentiary record, the Court concludes that plaintiffs have failed to make a showing of irreparable injury in the event that the challenged rehabilitation project proceeds apace, sufficient to warrant preliminary injunctive relief. Because this is not a class action, plaintiffs must show that they will be irreparably harmed during the pendency of this action by each challenged aspect of this rehabilitation project.

█ With respect to the conversion of buildings 8, 9 and 16 from gas heat to electric baseboard heat, the record shows that none of the three plaintiffs lives in any of those buildings.[17] While plaintiffs argue that once the conversion of the heating

---

16. making this choice. Moreover, since there is no allegation that any of the plaintiffs will be displaced as a result of the proposed reduction in the total number of four and five bedroom apartments in these buildings, it appears to the Court that they lack standing to pursue this alternative claim. See Part IIC(1), *infra.*

16. Plaintiff Frances Thompson resides in Building 2 (Saratoga Terrace). Plaintiff Jeanette Patenaude resides in Building 1 (Saratoga Terrace). Plaintiff Mary Holmes resides in Building 12 (Saratoga Heights). *See* Complaint: caption.

17. *See* note 16, *supra.*

system is completed, the advent of some form of checkmetering with tenant surcharges will be inevitable, there is nothing in this record to support a finding that plaintiffs' heating bills will be adversely affected by the type of heating system installed in buildings 8, 9 and 16. With respect to this claim then, plaintiffs have shown no injury in fact, irreparable or otherwise. While this conclusion necessarily raises the separate question of plaintiffs' standing to litigate this claim, discussion of that issue will be treated later under the discussion of the merits.

Turning now to the challenged installation of electric checkmeters and BTU flow meters, plaintiffs have not shown that they will be burdened with surcharges for heat or electricity prior to the entry of final judgment in this case. This Court credits the uncontradicted testimony and representations of defendant Lake that while the BHA intends to use the electric checkmeters and the BTU flow meters to monitor tenants' consumption of heat and electricity, BHA has no present intention of imposing surcharges for excess consumption or of requiring tenants to purchase their utilities directly from the utility suppliers.

█ With respect to plaintiffs' claim that they were denied due process and equal protection by the defendants' failure to accord Saratoga tenants the same level of formal participation in the planning of this redevelopment project as is mandated in cases where a public housing project is to be rehabilitated with so-called modernization funds pursuant to 42 U.S.C. § 1437*l* and 24 C.F.R. § 868 (*see* Part IA(2) of this opinion), the analysis is different. Plainly, "(a) discriminatory interference with the exercise of a constitutional right ... [may be] 'an injury for which a monetary award cannot be adequate compensation.'" *Auerbach v. Kinley,* 499 F.Supp. 1329, 1340–41 (N.D.N.Y.1980) (quoting *Jackson Dairy,*

*Inc., supra,* 596 F.2d at 72). If plaintiffs were entitled as a matter of constitutional law to the type of formal participation in the planning process contemplated by the modernization regulations, then a deprivation of that right could not be redressed once construction is substantially complete. However, the record demonstrates that Saratoga tenants were first notified that rehabilitation, including some form of metering conversion, was being considered as part of the "federalization" as early as October 1980. And by April 1981, after several management-tenant meetings at which these issues were aired, tenants were aware that the federalization and rehabilitation plans were going ahead. Finally, the October 14, 1981, issue of the "BHA-News" again mentioned the metering plans and stated that "work is scheduled to begin in January [1982]." [18] Moreover, even though plaintiffs contend that the level of participation they seek was foreclosed by the terms of the October 1980 notice, they did not move this Court for a temporary restraining order until January 29, 1982, when the planning stage well passed and some of the construction was already underway. Thus, with respect to the claimed denial of the right to formal participation in the planning of the rehabilitation work, the status quo had already been altered, and the preliminary relief sought on this claim is analogous to a mandatory injunction designed to send back to the drawing board only the work items relating to meter installation. Since plaintiffs are apparently willing to forego their asserted right to formal participation in the planning of all other aspects of the rehabilitation project, and since plaintiffs have failed to show irreparable harm stemming from the installation of the meters as scheduled, the record does not support a finding of sufficient irreparable harm on their participation claim to warrant entry of a mandatory injunction. *See Doe v. New York University,*

18. The newsletter stated the date as "January 1981," but it appears that this error did not mislead plaintiffs'; plaintiffs' counsel avers that they took this newsletter as their cue and obtained counsel shortly thereafter. Mills-Erickson Affidavit ¶ 5, February 2, 1982.

666 F.2d 761, 773–74 (2d Cir. 1981) (request for mandatory relief must be supported by a strong showing or irreparable injury). Finally, plaintiffs' interest in being heard before any utility surcharges are imposed by BHA is adequately protected under § 865.407(b) which, as defendants acknowledge will apply to Saratoga Apartments once the redeveloped project is accepted by HUD.[19]

## C. The Two-Pronged Merits Test

Even if the record could be read to support a finding of irreparable harm, plaintiffs have failed to show a likelihood of success on the merits. And while this case may present sufficiently serious questions going to the merits to make them a fair ground for further litigation, the relative hardships do not tip decidedly in plaintiffs' favor. Since this opinion is already somewhat overburdened, the following discussion will only highlight some of the more difficult hurdles which lie in the path to final judgment.

### 1. Standing [20]

█ As a corollary of the "case" and "controversy" limitations on the exercise of federal judicial power under the Constitution, a litigant must have "standing" to secure a judicial declaration of the rights and liabilities of the parties. The "standing" concept, however, "subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United for Separation of Church and State,* —— U.S. ——, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In the *Valley Forge* case, Justice Rehnquist distilled the constitutional aspect of standing as follows:

" . . . at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladsone, Realtors v. Village of Bellewood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

*Id.,* 102 S.Ct. at 758 (footnote omitted). These constitutional requirements are designed to ensure that legal questions are presented in a concrete factual setting and to reflect a due regard for both the role of the co-equal arms of the national government and the "autonomy of those persons likely to be most directly affected by a judicial order." *Id.,* 102 S.Ct. at 759.

█ In addition to Art. III requirements, the following prudential considerations bearing on standing have been postulated: First, "the plaintiff must generally assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Second, a plaintiff's complaint must fall "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1969). Finally, "Congress may enact statutes creating legal rights, the invasion of which creates standing, even

---

**19.** To the extent that plaintiffs assert irreparable injury stemming from their inability to participate in a formal energy audit under 24 C.F.R. § 301, it should be noted that in promulgating those regulations HUD considered and rejected the suggested provision of formal tenant participation: "We do not consider such provisions appropriate for the reason that energy conservation is a paramount national objective which must be effectuated without delay

that would result from tenant participation at every stage." 45 Fed.Reg. 30346 (May 7, 1980).

**20.** The Court recognizes that "standing" is not technically an inquiry into the merits of a claim; it is included under this section only for organizational purposes.

though no injury would exist without the statute." *Linda R. S. v. Richard D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148 n.3, 35 L.Ed.2d 536 (1973). In such cases, however, the question of standing is intertwined with the equally difficult task of ascertaining whether Congress established substantive rights in favor of persons in plaintiffs' status and impliedly intended to create a private cause of action to secure judicial redress of an alleged deprivation of the substantive right.[21]

One further preliminary matter warrants brief mention. This matter is before the Court on a motion for a preliminary injunction; accordingly, the factual findings and legal conclusions set forth in this opinion are not conclusive for the purposes of final judgment. However, this is not a case where the issue of standing is raised by way of a motion to dismiss the complaint; rather, plaintiffs had the advantage of a wide-ranging evidentiary hearing to flesh out their allegations. Therefore, the Court need not accept as true all material allegations of the complaint in determining the impact of the standing requirements on plaintiffs' likelihood of success; rather, we draw on the ample record, the main points of which were set out above.

With these general principles in mind, we turn to the claims of the plaintiffs, each of whom asserts standing as a lower-income tenant at Saratoga Apartments. Plaintiffs contend that BHA's failure to include them in the planning process which led to the rehabilitation project, together with BHA's failure to undertake a cost/benefit analysis and an energy audit with respect to the meter and utility conversions violated the Act and the due process and equal protection clauses of the Constitution. Plaintiffs contend that as an inevitable consequence of the meter installations and the limited gas to electric heat conversion, they will be surcharged for excess utility consumption and therefore suffer economic injury. In seeking injunctive relief, plaintiffs assert that they:

" . . . as the intended beneficiaries of the HUD funds and rehabilitation work, have a direct interest in seeing the money properly expended on meaningful, lawful, necessary rehabilitation items and in no other manner. Moreover, plaintiffs have a direct, protected interest in, and constitutional right to, participate in the process of selecting the best energy conservation measures, and intend to exercise the right once it is recognized and granted."

Plaintiffs' Brief at 4. In sum, plaintiffs assert an interest in seeing that the Act and the regulations (as they construe them) are followed by HUD and BHA, in preventing: (1) the misallocation of federal Development funds to work items which they assert will not result in substantial energy savings, (2) the diversion of those funds away from other, more effective, energy conservation measures and (3) the advent of tenant surcharges for excess utility consumption.

With respect to plaintiffs' challenge to the decision to install individual electric baseboard heaters in buildings 8, 9 and 16, plaintiffs can claim nothing more than that this conversion is illegal absent an energy audit, a cost/benefit analysis and adequate tenant participation in the decisionmaking process. This claim (and nothing further emerged at the hearing) falls far short of the Art. III requirements for "injury in fact." As Justice Powell stated in denying standing to persons seeking to vindicate their interest in preventing governmental action that assertedly contravened the Establishment Clause of the First Amendment:

They fail to identify any personal injury suffered by plaintiffs *as a consequence* of

---

**21.** As Justice Powell stated in *Warth:* "Essentially the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in plaintiff's position a right to judicial relief." 422 U.S. at 500, 95 S.Ct. at 2205 (footnote omitted).

the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms .... standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.

102 S.Ct. at 765 (emphasis in the original). If "the expenditure of public funds in an allegedly unconstitutional manner is not an injury sufficient to confer standing, even though the plaintiff contributes to the public coffers as a taxpayer," *id.* at 761, then it follows that plaintiffs' interest in preventing the expenditure of Development funds in a manner allegedly out of step with HUD regulations properly construed, cannot confer standing. There is no indication that these plaintiffs will be adversely affected by the installation of electric baseboard heat in buildings where they do not reside or that, if the installation was enjoined, these plaintiffs would be benefited. Similar defects were cited by the Second Circuit's *en banc* decision in *Evans v. Lynn,* 537 F.2d 571, 589 (2nd Cir. 1976), which denied standing to minority residents of Westchester County who lived in racially concentrated areas of the County and who sought to enjoin HUD's award of federal grant funds to assist the construction of sanitary and recreational facilities in another town within the County on the ground that the award would perpetuate the town's asserted practice of exclusionary zoning. Judge Mansfield, concurring with the *en banc* majority, noted that if the requested injunction were issued, it would not benefit the plaintiffs since, "HUD would presumably be free to use the money to aid construction of sewers and parks in San Francisco." *Id.* at 598. Like the plaintiffs in *Lynn,* the most that plaintiffs can realize from an injunction against the installation of baseboard heat in buildings other than their own, "is the satisfaction that federal funds will not be misused." *Id.*

Since this is not a class action, similar difficulties attend plaintiffs' effort to challenge the installation of electric checkmeters and BTU flowmeters in any of the buildings other than those in which they reside. The residents of those buildings are not before the Court, and there is no indication that these plaintiffs will be adversely affected by the installation of meters in those buildings or that they will be benefited by a project-wide injunction.

■ Even with respect to the meter installations in their own buildings, plaintiffs made no showing that they personally will suffer from the installations or from the future eventuality that the BHA will secure approval to institute some form of surcharges for utility consumption in excess of a reasonable allowance based on a calculation of past usage. To be sure, plaintiffs contend that *some* tenants may suffer financially from the adoption of a surcharge system if the base allowance fails to take account of such factors as the number and orientation of a given apartment's exterior walls and "the differences in life style and heating needs of, for instance, the elderly and handicapped, on the one hand, and active working families with children, on the other hand." Complaint ¶ 51.[22] However, there are no allegations suggesting that plaintiffs live in end-unit apartments or are themselves either elderly or handicapped. In sum, we are left with little more than the possibility that the BHA may adopt a surcharge system at some future time dis-

---

**22.** Plaintiffs' concerns are further explained in the following two paragraphs of their Complaint:

"51. In townhouse apartments, such as Saratoga Apartments, end unit location, by itself, can account for 10% greater utility consumption for heat.

"52. Variations in lifestyle and heating needs over which *some tenants* have no control, can account for variations in utility consumption for heat in amounts far in excess of 10%.

Complaint ¶¶ 51–52 (emphasis supplied).

counted by the tenuous possibility, unsub-stantiated by allegations of fact or proof in this record, that plaintiffs' utility consumption will exceed the basic allowance due to factors beyond their control and excluded from the base calculations, and that this scenario might be rendered more remote were the Court to afford relief now.

Plaintiffs also contend that if they had been afforded the formal participation rights enumerated in the Modernization regulations, 24 C.F.R. § 868.5, and if HUD had insisted upon and the BHA performed an Energy Audit and a cost/benefit analysis under 24 C.F.R. § 865, the installation of electric checkmeters and BTU flow meters might have been found economically unfeasible, that the funds now allocated to those work items might then become available for use on other, presumably cost-effective energy conservation measures. This supposition may have been reasonable at the time the complaint was filed; the record as it now stands, however, renders this assertion doubtful, given the full panoply of energy conservation measures included in the redevelopment plans.[23] Moreover, an analogous standing argument was considered and rejected in *City of Hartford v. Towns of Glastonbury,* 561 F.2d 1032, 1048 (2d Cir. 1976) (*en banc*).

In that case, the City of Hartford, Connecticut and two of its lower-income residents sought to enjoin several suburban towns from receiving or expending Community Development grants approved by HUD, on the ground that the defendant towns' grant applications did not include a reasonable estimate of the number of lower-income persons "expected to reside" within the respective communities, an apparent violation of a statutory prerequisite for HUD approval of such Title I grants. The individual plaintiffs claimed that this statutory violation injured them by making it less likely that they would benefit from the Act's objective of encouraging the wealthy to return to the inner cities and to facilitate the movement of lower-income persons to the suburbs. *Id.* at 1050. In concluding that the plaintiffs lacked standing, the Court assumed without deciding that plaintiffs had a protectable expectancy interest in the benefits that should accrue to them under the Act. In addition to finding an absence of proof that the defendants' omission of an "expected to reside" figure had any detrimental effect on plaintiffs' assumed interest, the Court further concluded that it was speculative whether the requested injunction would redress plaintiffs' alleged injury. Plaintiffs had claimed that if the defendant towns failed to comply with the Act, their grants would be reallocated, and it was at least possible that the City of Hartford would be awarded the theoretically available funds. The *en banc* majority rejected this theory as inadequate to support standing. In his concurring opinion Judge Kaufman noted that standing must be assessed at the outset of a lawsuit, and stated that he did not believe that, "the mere chance (that) Hartford will receive a portion of the (funds) available for reallocation as a result of (a town's) refusal to reapply for a community development grant . . .—a chance that seems minimal in any event—would suffice to confer standing on Hartford or its low-income residents." *Id.* at 1053–54 (concurring opinion).

As in the *City of Hartford* case, it is entirely speculative to assert that the minimal savings that would result if the metering is enjoined (*see* discussion in Part IB above) would then be both available to BHA and used for some as yet unidentified energy conservation measure that would benefit these plaintiffs in a tangible way. Moreover, given the present state of the record, it appears that the two challenged metering schemes meet the cost-effectiveness criteria contained in § 865 of the regu-

**23.** When confronted with this catalogue of energy conservation measure, plaintiffs failed to identify any additional measures which they would recommend if the Court were to order BHA to comply with the Modernization regulations.

lations, and serve independent purposes in any event.

Plaintiffs may be arguing that the Act "creates legal rights, the invasion of which creates standing, ..." *Linda R. S., supra.* But the question then becomes whether the "statutory provision on which the claim rests properly can be understood as granting persons in plaintiffs' position a right to judicial relief." *Warth, supra,* 422 U.S. at 500, 95 S.Ct. at 2205 (footnote omitted). Even if such a private cause of action may be inferred from the Act, plaintiffs must satisfy the injury in fact requirement.

### 2. Private Cause of Action Under the Act or 42 U.S.C. § 1983.

In this case, plaintiffs have proceeded on two fronts to ensure obedience to what they perceive to be the regulatory norms and to remedy what they assert is deficient administrative performance. Thus, plaintiffs assert claims against HUD to compel enforcement of the cost/benefit, energy audit, and tenant participation regulations in the context of a grant of Development funds under 24 C.F.R. § 841. Additionally, plaintiffs assert similar claims against the BHA in an effort to compel formal compliance with regulations which HUD maintains do not apply to projects using Development funds.

With respect to the statutory claims against the BHA, plaintiffs must establish either that Congress intended to provide a private cause of action in favor of tenants of public housing projects to redress alleged violations of the regulatory norms adopted by HUD or that 42 U.S.C. § 1983 provides a remedial vehicle for private suitors in these circumstances. If plaintiffs can establish that the Act creates the type of substantive personal rights from which a private cause of action could be inferred, they will have gone a long way toward demonstrating the type of statutory standing envisioned by Justice Powell in *Warth.*[24] A similar showing is necessary to support a conclusion that § 1983 properly may be invoked against the BHA[25] to litigate these statutory claims. Based upon a review of recent Supreme Court decisions, however, this Court remains unconvinced that Congress intended that the claims asserted against the BHA in this case should be subject to judicial review at the behest of individual tenants.

The questions are whether Congress established personal statutory rights in favor of public housing tenants, whose apartments are in the process of being redeveloped with Development funds, which would be violated by the installation of electric check meters or BTU flow meters absent compliance with the cost/benefit and energy audit regulations and without providing the level of tenant participation in the planning of such utility modifications that would obtain if the project was relying on Modernization funds, and if so, whether Congress further intended judicial review to rectify alleged deprivations of these rights at the behest of private suitors.

In *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979), Justice Stewart framed the matter as follows:

"The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction. While some opinions of the Court have placed considera-

---

**24.** *See* Stewart & Sunstein, "Public Programs and Private Rights," 95 Harv.L.Rev. 1195, 1281 n. 369 ("For new-property hearing rights and private rights of action, standing is based on entitlement, which in turn determines the ultimate resolution of the merits as well as the threshold question of access to the court."). The Court found this article especially useful in analyzing the troublesome issues raised in the present case.

**25.** Since § 1983 is limited in its reach to persons who, acting *under color of State law,* deprive another of rights secured by the federal Constitution or statutes, and since there is no allegation that the Secretary of HUD was acting under State rather than federal law in approving the award of Development funds or that the Secretary conspired with the BHA defendants, plaintiffs cannot rely on § 1983 as a cause of action against the Secretary.

ble emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear. (footnotes omitted)

*Accord, Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981) ("The key to the inquiry is the intent of the legislature."). In determining legislative intent, courts focus initially on the language of the statute before turning to the other traditional aids to statutory construction. An earlier and somewhat broader inquiry was set out by Justice Brennan in the seminal case of *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975):

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted" ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? (citations omitted).

Turning first to the language of the United States Housing Act, as amended, 42 U.S.C. § 1437 *et seq.,* we find nothing even similar to the express citizen-suit provisions that Congress increasingly uses when it intends to authorize private enforcement. *See* e.g., Education of All Handicapped Children Act, 20 U.S.C. § 1415(e); The Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1415(g), and the Federal Water Pollution Act, 33 U.S.C. § 1365(a), (b). In addition,

our review of the legislative history of the Housing and Community Development Act of 1974 sheds no light on Congress' intention with respect to the availability of private enforcement suits. The structure of the Act, however, is analogous to that of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 *et seq.,* which the Supreme Court recently held did not create private substantive rights. *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Like the statute in *Pennhurst,* the Act under review here is essentially a federal-state funding scheme designed "to assist the several States and their political subdivisions" through the use of federal grants to finance the development and the operation of suitable lower-income rental units. 42 U.S.C. §§ 1437, 1437b, 1437c. Compare *id.* with 42 U.S.C. § 6000(b), reprinted in *Pennhurst, supra,* 101 S.Ct. at 1537 n. 8. The Act is further designed to vest substantial responsibility for the administration of federally-assisted housing projects in local public housing agencies, such as the BHA. Section 1437d(c) of the Act provides:

> Every contract for annual contributions shall provide that—the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to—the establishment of effective tenant-management relationships designed to assure that satisfactory standards of tenant security and project maintenance are formulated and that the public housing agency (together with tenant councils where they exist) enforces those standards fully and effectively....

42 U.S.C. § 1437d(c)(4)(C). These broad declarations of policy indicate that the main thrust of the statute was to provide direct financial benefits to the States and local agencies in order to increase and improve the housing stock available to lower-income

tenants. However, the fact that lower-income tenants are indirect beneficiaries of this federal funding scheme does not suffice to create enforceable substantive rights in their favor; indeed, § 1437d(c) strongly suggests that project management and maintenance standards are to be enforced by the local agency in conjunction with existing tenant councils, with overarching review by the Secretary as a party to the annual contributions contract. *See Perry v. Housing Authority of the City of Charleston,* 664 F.2d 1210, 1212–14 (4th Cir. 1981). In sum, there is nothing in the language, the structure or the legislative history of the Act to indicate that Congress intended to create legally enforceable rights in favor of tenants of public housing projects undergoing development with federal funds.

This conclusion finds strong support in the Fourth Circuit's recent decision in *Perry v. H. U. A. C., supra.* In that case, tenants of a public housing project sought declaratory and injunctive relief from indecent housing conditions in a federally-assisted project. On appeal from a judgment dismissing the complaint for failure to state a claim, the Fourth Circuit affirmed, holding that the Act contained no implied cause of action against the local housing agency, notwithstanding that tenants are among the ultimate beneficiaries of the Act. Equally instructive is the Supreme Court's decision denying an implied private right of action under the Davis-Bacon Act. *Universities Research Ass'n. v. Coutu,* 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981). The Davis-Bacon Act requires that certain federal construction contracts include a stipulation that laborers and mechanics will be paid not less than the wage rate which the Secretary of Labor determines to be the prevailing rate in the area. The issue be-

fore the Supreme Court was "whether the Act confers upon an employee a private right of action for back wages under a contract that has been administratively determined *not* to call for Davis-Bacon work, and that therefore does not contain a prevailing wage stipulation." 450 U.S. at 756, 101 S.Ct. at 1454. Without deciding whether the Act creates an implied right of action to enforce contracts that *contain* specific prevailing wage stipulations, *i.e.* at 769, 101 S.Ct. at 1460, the Court found no basis for implying a private right of action under the Act where the administrative agency responsible for coverage decisions has not found that the work qualifies for a prevailing wage stipulation. In reaching this conclusion, the Court acknowledged that construction workers on federal contracts were the intended beneficiaries of the Act, but reasoned that there is little support for inferring a private remedy in favor of individuals where Congress "has framed the statute simply as a general prohibition or a command to a federal agency." *Id.* at 772, 101 S.Ct. at 1462. With that principle in mind, the Court stated: "Since § 1 of the Act is simply 'phrased as a directive to federal agencies engaged in the disbursement of public funds,' its language provides no support for the implication of a private remedy." 450 U.S. at 772–73, 101 S.Ct. at 1462–63 (footnote omitted) (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 693 n. 14, 99 S.Ct. 1946, 1955 n. 14, 60 L.Ed.2d 560).

Like the statutory provision at issue in *Coutu,* the regulations on which plaintiffs rely here, 24 C.F.R. § 865, are phrased not in terms of individual rights, but as general directives to agencies responsible for the administration of public housing.[26] Moreover, the regulations do not appear to be

---

**26.** In *Lechtner v. Brownyard,* 679 F.2d 322 (3rd Cir. 1982), summarized in 50 U.S.L.W. 2738 (June 22, 1982), the Court applied the principles of *TAMA, supra,* and *Touche Ross & Co. v. Reddington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), rather than the analysis in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)

to the question whether a private cause of action should be inferred from the personal attack rule promulgated by the Federal Communications Commission; finding no affirmative evidence of an intention to create privately enforceable rights, the Court held that a violation of the regulation is not actionable.

designed for the special benefit of individual tenants; rather they are designed to enlist the aid of federally-assisted public housing agencies in achieving the collective, national goal of energy conservation.

 It remains to be considered whether plaintiffs may litigate the BHA's alleged violations of the Act and regulations under 42 U.S.C. § 1983, for it is now settled that § 1983 provides a cause of action to redress a deprivation by state officials of rights created by federal statutes. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Here, plaintiffs' claim arguably falls within the scope of *Thiboutot,* "because it involves a suit by a private party claiming that a federal statute has been violated under color of state law, causing an injury." *Middlesex Cty. Sewer Auth., supra,* 101 S.Ct. at 2626. However, in order for a plaintiff to prevail under a § 1983 claim for statutory violations, the court must determine: "(i) whether Congress (has) foreclosed private enforcement of that statute in the enactment itself, and (ii) whether the statute at issue ... (is) the kind that created enforceable 'rights' under § 1983." *Id.,* citing *Pennhurst, supra,* 101 S.Ct. at 1545. If the answer to either inquiry is "no," then plaintiffs have no cause of action under § 1983 to redress alleged violations of the Act. In this case, plaintiffs have failed to point to any substantive provision in the Act which can be read as creating a substantive right in favor of individual tenants. Here, we have nothing even comparable to the rather detailed "Bill of Rights" provision, 42 U.S.C. § 6010 which the *Pennhurst* Court found insufficient to create enforceable rights in favor of handicapped persons. In sum, since it is far from clear that the BHA's failure to comply with the cost/benefit, energy audit and modernization regulations violated any legally cognizable rights of these tenants under the Act, we conclude that plaintiffs have failed to show a likelihood of succeeding on their § 1983 claim. *See Perry, supra,* 664 F.2d at 1217–18 (The Housing Act, 42 U.S.C. § 1437, "does not create any legally cognizable rights in tenants of programs funded under the housing statutes." (footnote omitted)).

### 3. The Remaining Claims

██ Plaintiffs also base their request for preliminary injunctive relief on the claim that HUD failed to require the BHA to comply with the provisions of 24 C.F.R. §§ 865 and 868 as a condition to the award of Development Funds under the Act and the Development regulations.[27] However, even if the plaintiffs have properly invoked the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* they have failed to show a likelihood of success on the merits. First, it is not at all clear that HUD has violated either the cost/benefit regulations for metering conversion or the tenant participation regulations, since these provisions are not, by their terms, applicable to projects undergoing development under 24 C.F.R. § 841. Second, the metering regulations do not expressly prohibit HUD approval of meter installations in the absence of a cost/benefit analysis where, as here, the meters will serve purposes other than providing the data necessary for implementation of surcharges. Third, where as here, the Secretary takes the position that neither set of regulations applies to projects in the Development

---

**27.** Professors Stewart and Sunstein characterize suits brought against the responsible federal agency to challenge the agency's failure to take action as asserting a "private right of initiation," as distinguished from those suits or claims against regulated parties which assert a private right of action. "Public Programs and Private Rights," *supra* n. 22, 95 Harv.L.Rev. at 1197, 1205–06 (noting that in recent "right of initiation" decisions, courts adopt a deferential standard of review, acknowledge the importance of agency discretion, competing interests and limited budgets; and, even where a violation is shown, do not readily compel enforcement unless the claims of the agency are "demonstrably outweighed by the interests asserted by the beneficiary.")

phase pursuant to § 841, plaintiffs must overcome the principle that the interpretation adopted by the agency charged with the administration of a statutory scheme and responsible for the promulgation of the regulations at issue, is entitled to substantial deference. *See e.g., Blum v. Bacon,* —— U.S. ——, ——, 102 S.Ct. 2355, 2362, 73 L.Ed.2d 728 (1982); *DuPont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1977); *Ballard v. Rockeville Centre Housing Authority,* 605 F.2d 1283, 1286 (2d Cir. 1979).

■ With respect to HUD's failure to condition approval of the BHA's Development loan on the submission of an energy audit pursuant to 24 C.F.R. § 865.301 *et seq.,* the analysis differs, but the same conclusion emerges for the purpose of the present motion. While HUD apparently contends that the energy audit regulations are similarly inapplicable to projects assisted with Development funds, that position is undercut substantially by the following provision governing funding of energy audits:

§ 865.307 Funding.

"The cost of accomplishing cost-effective energy conservation measures, including the cost of performing energy audits, shall be funded from operating funds of the PHA to the extent feasible. Where sufficeint operating funds are not available for this purpose such costs are eligible for inclusion in a Modernization Program, *for funding from any available Development Funds in case* (sic) *of projects still in development* or for other available funds that HUD may designate to be used for energy conservation."

*Id.,* 45 Fed.Reg. 30348 (May 7, 1980) (emphasis added). While this language supports plaintiffs' legal position, the facts adduced at the hearing in this case demonstrate that the BHA performed the equivalent of an energy audit in developing the contract specifications for the rehabilitation of Saratoga Apartments. *See* Part IB(2), above. In any event, nothing in the energy audit regulations expressly prohibits an award of Development funds prior to the completion of an energy audit, and the regulations themselves provide only that required energy audits be completed for all covered projects by May 27, 1983.[28] Since plaintiffs were unable to identify any energy conservation measures that were not included in the contract specifications but would have been designated as priority work items had the energy audit been prepared in conformity with the regulation, any violation that may be proven after a plenary hearing will be a technical one at most.

■ Turning finally to plaintiffs' constitutional claims, we conclude that the installation of electric meters and BTU flow meters does not deprive plaintiffs of whatever property interests they may possess based on their tenancy at Saratoga Apartments. While the imposition of utility surcharges might well constitute a sufficient change in the status quo of their relationship with the BHA so as to trigger the requirements of due process, all parties agree that if surcharging is recommended, the tenant participation provisions in 24 C.F.R. § 407 will then apply to Saratoga Apartments. On this record, plaintiffs have failed to show that those protections do not pass constitutional muster.

While plaintiffs' equal protection claim stems solely from the "greater" participation accorded to tenants whose apartments are being rehabilitated pursuant to the Modernization regulations, it is telling for present purposes to note that plaintiffs do not now seek to participate in the planning of contract specifications other than those concerned with utility metering.

---

28. *But see* 24 C.F.R. § 865.310(b), 45 Fed.Reg. at 30348:

"(b) For a public housing project to be approved after September 30, 1980 by HUD, for Comprehensive Modernization, the PHA shall have completed an energy audit on the project prior to submission of the Final Application for modernization.

Since we have already concluded that tenants are afforded constitutionally adequate process prior to the imposition of utility surcharges, there is no reason to enjoin the installation of the meters themselves.

**D. The Balance of Hardships in This Case Does Not Tip in Plaintiffs' Favor.**

As plaintiffs themselves state, the harm with which they are most concerned is the possibility that the BHA will adopt a utility surcharge system, because under such a system, they might incur a surcharge which would seriously strain their already limited budgets. As we have seen, however, the BHA currently plans to continue paying all utility charges following the installation of electric checkmeters and BTU flow meters. Moreover, the plaintiffs will be afforded notice and an opportunity to comment prior to the adoption of any surcharge system. Finally, it appears that the BHA must secure the approval of the New York Public Service Commission for any such system. In sum, it does not appear that plaintiffs will suffer any substantial hardship if the requested injunction is denied. If, on the other hand, the injunction were to be granted, the other tenants of the Saratoga Apartments will be forced to remain in temporary quarters for a longer period of time; the BHA would face the likely prospect of substantial delay claims from contractors whose work schedule is interrupted, and incur additional costs as a consequence of the need for redesign, renegotiation of contracts, and the return of such items as the BTU flow meters which were already on order at the time this motion was brought on for hearing. On this record, it cannot be said that the balance of hardships tips decidedly in favor of the plaintiffs.

### CONCLUSION AND ORDER

For all of the foregoing reasons, the plaintiffs' motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.